# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

MICHAEL KAYSER,
          *Defendant-Appellant.*

No. 06-50178

D.C. No.
05-CR-0288-JTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted
December 5, 2006—Pasadena, California

Filed May 31, 2007

Before: Stephen Reinhardt, Alex Kozinski, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Dissent by Judge Kozinski

6569

**COUNSEL**

David J. Zugman, Burcham & Zugman, APC, San Diego, California, for the defendant-appellant.

Carol C. Lam, United States Attorney; Bruce R. Castetter, George Aguilar, Assistant United States Attorneys, San Diego, California, for the plaintiff-appellee.

## OPINION

IKUTA, Circuit Judge:

Michael Kayser appeals from his conviction for tax evasion in violation of 26 U.S.C. § 7201 for the year 2000. He alleges, among other things, that the district court erred in failing to instruct the jury in accordance with his theory of defense. We have jurisdiction under 28 U.S.C. § 1291 and we reverse and remand.

## BACKGROUND

From November 1998 to May 2000, A2Z USA, Inc. ("A2Z") employed Kayser first as a salesperson and later as a vice president for its Internet-based shopping mall. A2Z compensated Kayser as an independent contractor and paid him a commission by checks made out to his name. In July 1999, Kayser incorporated Aspen Ventures Inc. ("Aspen Ventures") to receive A2Z income and take business deductions related to that income.

After failing to file timely tax returns for 1998 through 2000, Kayser ultimately filed his delinquent individual and corporate tax returns for those years in August 2001. Kayser was subsequently indicted on two counts of attempted income tax evasion (for 1999 and 2000) in violation of 26 U.S.C. § 7201.[1]

---

[1]Section 7201 provides:

> Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

At trial, the government alleged that Kayser had improperly structured his individual and Aspen Ventures' corporate returns for 1999 and 2000 to evade the payment of taxes on his A2Z activities. For the year 1999 (count 1), the government contended that Kayser received $104,000 of A2Z income that should have been reported on his individual return, but Kayser improperly reported this income on Aspen Ventures' corporate return. For the year 2000 (count 2), the government showed that Kayser failed to report his A2Z income on either his individual or Aspen Ventures' corporate return.[2]

However, Kayser did report $49,026 in deductible business expenses on Aspen Ventures' 2000 return. These deductions were composed of automobile expenses, office expenses, utilities, travel and entertainment expenses, and rents. Kayser's accountant testified that the deductions were calculated from receipts and records maintained by Kayser. As reported, the expenses generated a net operating loss of $49,026 on Aspen Ventures' 2000 return, which Kayser then carried back to eliminate the corporate taxes owed by Aspen Ventures on the income it reported for 1999.

The government alleged that Kayser willfully structured his individual and corporate returns in the manner described above to evade taxes, and that as a result of this improper reporting, Kayser was able to declare virtually no tax due on the $145,000 or more he received from A2Z as income in 1999 and 2000.

At trial, Kayser's primary theory of defense was that he had not willfully evaded paying taxes. During the course of the trial, Kayser raised a second theory, namely, that the A2Z income he failed to report on his individual return in 2000

---

[2]Testimony at trial indicated that Kayser received either $41,765 or $53,445 in income from A2Z in 2000 and that this income should have been reported on Kayser's individual return for 2000.

should be offset by the $49,026 in business deductions he improperly reported on Aspen Ventures' corporate returns in 2000 and carried back to 1999. This theory was supported by two principal pieces of evidence. First, Kayser testified that he incurred the entire $49,026 in business deductions in connection with the production of the individual A2Z income he received in 2000. In addition, Kayser's accountant and the government's expert both testified that an independent contractor's legitimate and allowable business deductions could generally be used to reduce business income on an individual return.

On the last day of trial, Kayser asked the district court to approve the following jury instruction: "If the defendant had unclaimed deductions which would have offset his tax liability such that there was no tax due and owing, then there is no tax deficiency." The government argued that this instruction was unwarranted because Kayser had introduced no evidence of previously "unclaimed" deductions. The government also argued that Kayser's theory of defense was improper under *United States v. Miller*, 545 F.2d 1204 (9th Cir. 1976), which the government read as precluding Kayser from arguing that the business deductions he reported on Aspen Ventures' returns could be used to negate his individual tax deficiency.

The district court agreed with the government and declined to give the requested instruction. The district court noted that the evidence did not support the instruction and also implicitly agreed with the government's argument that *Miller* precluded the theory of defense in this case.

Following trial, the jury found Kayser guilty of tax evasion for the year 2000, but failed to reach a unanimous verdict on the count concerning tax evasion in 1999. On appeal, Kayser argues that the district court erred by rejecting his proposed jury instruction.

## DISCUSSION

Kayser contends he was entitled to a jury instruction on his theory that the government could not prove there was a tax deficiency in 2000 if Kayser had sufficient allowable business expenses to offset his unreported A2Z income for that year. Our cases hold that "[a] defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence." *United States v. Fejes*, 232 F.3d 696, 702 (9th Cir. 2000) (internal quotations omitted). Here, the district court declined to give Kayser's proposed instruction on two grounds, namely, that the instruction was erroneous as a matter of law under *United States v. Miller*, 545 F.2d 1204 (9th Cir. 1976) and that the evidence was insufficient to support the instruction. We examine both of these determinations in turn.

### A.

We first consider whether Kayser's proposed instruction was erroneous as a matter of law. The elements of attempted income tax evasion under 26 U.S.C. § 7201 are: (1) willfulness; (2) the existence of a tax deficiency; and (3) an affirmative act constituting an evasion or attempted evasion of the tax. *Sansone v. United States*, 380 U.S. 343, 351 (1965); *see also United States v. Marashi*, 913 F.2d 724, 735 (9th Cir. 1990). A tax deficiency occurs when a defendant owes more federal income tax for the applicable tax year than was declared due on the defendant's income tax return. *See* 9TH CIR. CRIM. JURY INSTR. 9.35 (2005).

A defendant may negate the element of tax deficiency in a tax evasion case with evidence of unreported deductions. *See United States v. Marabelles*, 724 F.2d 1374, 1378-79 (9th Cir. 1984); *Elwert v. United States*, 231 F.2d 928, 933 (9th Cir. 1956). Both *Marabelles* and *Elwert* involved small business owners who (among other things) under-reported their income for one or more years. *Marabelles*, 724 F.2d at 1378-79;

*Elwert*, 231 F.2d at 933-34. At trial for criminal tax evasion, the defendants introduced evidence of deductions for labor costs that had not been claimed on their returns in order to disprove the element of tax deficiency. *Marabelles*, 724 F.2d at 1378-79; *Elwert*, 231 F.2d at 933-34. In rejecting the defendants' challenges to the sufficiency of the evidence supporting their respective convictions, we held that "the burden is on the defendant to prove that he had allowable deductions that were not shown in his return, once the Government establishes unreported income and allows the deductions claimed by the defendant in [his] return and others that it can calculate without his assistance." *Marabelles*, 724 F.2d at 1379 n.3; *Elwert*, 231 F.2d at 933.

Notwithstanding the greater sophistication of Kayser's alleged tax evasion scheme, *Marabelles* and *Elwert* are controlling in Kayser's case. Like the defendants in those cases, Kayser failed to report income on his individual return and was entitled to demonstrate at trial that he had deductions that could offset this previously unreported income. *See Marabelles*, 724 F.2d at 1379 n.3; *Elwert*, 231 F.2d at 933.

The government, however, argues that *United States v. Miller* prohibits a defendant who reports his income and deductions in one manner from arguing for an alternative characterization at trial. *See Miller*, 545 F.2d at 1215 (rejecting defendant's "return-of-capital" defense because the defendant "presented no concrete proof that the amounts were considered, intended, or recorded on the corporate records as a return of capital at the time they were made"); *see also United States v. Boulware (Boulware II)*, 470 F.3d 931, 935 (9th Cir. 2006) (same). The government thus contends that Kayser's decision to report the $49,026 in business expenses on Aspen Ventures' returns prevents Kayser from now arguing that these expenses were actually incurred by him individually in relation to his A2Z activities as an independent contractor.

**[1]** Contrary to the government's argument, *Miller* does not preclude a defendant in a tax evasion case from asserting a defense that is inconsistent with information falsely reported on his challenged tax returns. *Miller*, 545 F.2d at 1215-16. Rather, *Miller* allows a defendant to present evidence at trial regarding the facts of the transaction at issue, notwithstanding the defendant's improper or "scrambled" reporting of those facts. *Id*. In *Miller*, the government alleged that the defendant had diverted substantial sums from his closely held corporation and failed to report the funds as income. *Id*. at 1209. The diverted funds had been recorded on the corporation's books as "repayments of loans," which were later shown to be nonexistent or false. *Id*. at 1209, 1215-16.

Miller tried to convince the district court to apply certain technical tax rules to transform a taxable diversion of funds into a non-taxable return of capital. *Id*. at 1210-14. Miller argued that a court must automatically treat funds diverted by a shareholder from a closely held corporation as a constructive corporate distribution, pursuant to a rule established in civil tax decisions. *Id.* Under the facts of his case, Miller contended that such a distribution would be a non-taxable return of capital. *Id*. at 1211 & n.9. Therefore, the government could not prove a tax deficiency and Miller could not be convicted of tax evasion. *Id*. at 1211-12.

We rejected Miller's theory, holding that the civil constructive distribution rules did not automatically apply in a criminal tax evasion case. *Id.* at 1214-15. Instead, we held that a criminal defendant wishing to raise a "return-of-capital" defense had to introduce evidence that the diverted funds were, in fact, a return of capital. *Id.* at 1215. For example, the defendant could demonstrate that the diverted funds were intended to be a return of capital by showing an adjustment in the corporate records indicating a reduction in his basis at the time of distribution. *See id.* at 1215.

Consistent with this ruling, Miller was allowed to present evidence to establish his return-of-capital defense at trial. *See*

*id.* at 1215-16. However, the record did not support his defense: among other things, there was a substantial question whether Miller was even a shareholder of the corporation who could receive payments as a return of capital. *Id.* Based on the evidence, the district court concluded that the diverted funds constituted additional taxable salary, rather than a non-taxable return of capital. *Id.* at 1215. We held that the district court's conclusion was not clearly erroneous. *Id.* at 1215-16.

Neither we nor the district court suggested that Miller was bound by the original characterization of the diverted funds, i.e., the corporation's characterization of the diverted funds as "repayments of loans" or Miller's failure to report the diverted funds on his tax returns. *Id.* at 1214-16. Rather, we concluded that "whether diverted funds constitute constructive corporate distributions depends on the factual circumstances involved in each case under consideration," *id.* at 1214, and the demonstration made by the defendant at trial, *id.* at 1215.

**[2]** The import of our holding in *Miller* is that a defendant remains free to present evidence that funds diverted from a corporation are a non-taxable return of capital, regardless of the manner in which he or the corporation originally reported the transaction. *See id.* at 1214-16; *see also Boulware II*, 470 F.3d at 934-35.[3] *Miller* is thus consistent with *Marabelles* and

---

[3]*Boulware II* does not hold otherwise. In *Boulware II*, the government moved *in limine* to preclude the defendant from introducing expert testimony that the diverted funds *could* be deemed a constructive dividend constituting a return of capital. 470 F.3d at 933-34. The trial court granted the government's motion, reasoning that the evidence proffered did not go to the question of whether the funds were, in fact, "considered, intended, or recorded on the corporate records as a return of capital" at the time of the distribution. *Id.* at 934-35 (internal quotation marks omitted). We affirmed the district court's ruling. *Id.* In so holding, we did not conclude that Boulware was bound by the manner in which he originally reported the transaction. *See id.* Nor did we hold that Boulware was precluded from introducing evidence to support his return-of-capital theory. *See id.*

*Elwert*, which provide the controlling authority in this case. Like *Miller*, *Marabelles* and *Elwert* permit defendants to present evidence at trial to establish the nature of their business transactions—including their actual business deductions— even when the position they take at trial is inconsistent with their original tax reportings. *Marabelles*, 724 F.2d at 1379 n.3; *Elwert*, 231 F.2d at 933.

**[3]** Following *Marabelles* and *Elwert*, we hold that if Kayser had business expenses that were allowable offsets against his individual income, he had the right to show them and explain them as part of his defense for tax evasion. *Marabelles*, 724 F.2d at 1379 n.3; *Elwert*, 231 F.2d at 933. The fact that Kayser improperly reported the deductions he now claims negate his individual deficiency, while the defendants in *Marabelles* and *Elwert* simply failed to report certain deductions, does not alter our conclusion. Kayser's improper report of deductions on his corporate return does not change the underlying nature of these expenses, although the filing of a false return itself may constitute a separate offense. *See* 26 U.S.C. § 7206(1). When the Supreme Court held that a tax deficiency is a necessary element of tax evasion under section 7201, it made no exception for cases where the defendant owed no tax to the government but had improperly reported the underlying income and deductions that demonstrated this lack of a tax deficiency. *See Lawn v. United States*, 355 U.S. 339, 361 (1958); *Sansone*, 380 U.S. at 351, 354. Therefore, Kayser's prior report of $49,026 in deductions on Aspen Ventures' returns does not preclude him from now arguing that

---

Rather, we held that under *Miller*, Boulware was required to show that the distribution was intended to be a return of capital. *Id.* at 933-35. Because Boulware's proffered evidence did not go to the question whether the diverted funds " 'were considered, intended, or recorded on the corporate records as a return of capital at the time they were made,' " *id.* at 935 (quoting *Miller*, 545 F.2d at 1215), we held the district court properly concluded that Boulware failed to lay the requisite evidentiary foundation for a return-of-capital defense. *Id.* at 934-35.

these deductions are offsets to his individual A2Z income, provided that he carries the burden of demonstrating the legitimacy and allowability of these deductions. *See Marabelles*, 724 F.2d at 1379 n.3 ("the burden is on the defendant to prove that he had *allowable* deductions that were not shown in his return" (emphasis added) (citing *Elwert*, 231 F.2d at 933)).[4]

B.

**[4]** Having concluded that Kayser's theory of defense represents a correct application of *Marabelles* and *Elwert*, we next turn to the question whether Kayser established an adequate foundation in the record to warrant an instruction on this theory. The legal standard is generous: "a defendant is entitled to an instruction concerning his theory of the case if the theory is legally sound and evidence in the case makes it applicable, even if the evidence is weak, insufficient, inconsistent, or of doubtful credibility." *United States v. Washington*, 819 F.2d 221, 225 (9th Cir. 1987). A defendant needs to show only that "there is evidence upon which the jury could rationally sustain the defense." *United States v. Jackson*, 726 F.2d 1466, 1468 (9th Cir. 1984) (per curiam); *see also United States v. Johnson*, 459 F.3d 990, 993 (9th Cir. 2006). Where, as here, factual disputes are raised, this standard protects the defendant's right to have questions of evidentiary weight and credibility resolved by the jury. *Jackson*, 726 F.2d at 1468; *see also Johnson*, 459 F.3d at 993.

We review the district court's conclusion that Kayser's proposed instruction was not supported by sufficient evidence for an abuse of discretion. *Fejes*, 232 F.3d at 702.

**[5]** Kayser's theory of defense was that the jury should

---

[4]Kayser did not argue that the $49,026 in business deductions he reported on Aspen Ventures' 2000 return "flowed through" Aspen Ventures to his individual return. The government's argument that Aspen Ventures is not a flow-through entity is therefore irrelevant.

apply the $49,026 in deductions he initially reported on his corporate tax return in 2000 to eliminate the deficiency on his personal return for that year. Under *Marabelles* and *Elwert*, this theory required Kayser to establish two elements: First, Kayser had to show that the $49,026 represented legitimate business expenses actually incurred by him in an individual capacity. Second, Kayser had to demonstrate that the $49,026 of business expenses represented "allowable" deductions on his individual return within the meaning of the Tax Code. *Marabelles*, 724 F.2d at 1379 n.3 (citing *Elwert*, 231 F.2d at 933). We conclude that Kayser's evidence was sufficient to warrant a jury instruction on this theory.

[6] Through his own testimony, and the testimony of his accountant, Kayser presented evidence that he maintained records and receipts of his business expenses and that from those records, his accountant calculated the $49,026 of business expenses reported on Kayser's corporate return. Kayser further testified that all of the $49,026 in business expenses was incurred in connection with his previously unreported individual A2Z income for 2000.[5] On this record, a rational jury could have concluded that Kayser actually incurred $49,026 in business expenses and that these expenses were legitimate.

[7] We also conclude that there was sufficient evidence

---

[5]The dissent contends that "Kayser made only very broad statements that the deductions relate to his personal income, and even then he hedged quite a bit." Dissent at 6590. However, as the dissent acknowledges, on direct examination, Kayser specifically and unambiguously testified that "every deduction" reported on Aspen Ventures' 2000 corporate return related directly to Kayser's A2Z income. The prosecution made effective use of its cross-examination to raise doubts about the assertions Kayser made on direct examination. While Kayser's stumbling answers on cross-examination may further weaken the evidence supporting his defense, under our case law, Kayser is entitled to his proposed instruction even if the evidence supporting his theory of defense "is weak, insufficient, inconsistent, or of doubtful credibility." *Washington*, 819 F.2d at 225.

from which a rational jury could find that the $49,026 represented allowable business expenses with respect to Kayser's personal return. The record included Aspen Ventures' 2000 tax return, which detailed that the business deductions in the amount of $49,026 were composed of automobile expenses, office expenses, utilities, travel and entertainment expenses, and rents. The government did not challenge either the character, amount, or validity of the expenses. At the same time, both the government's expert and Kayser's accountant testified that as a general matter, business expenses of the type reported on Aspen Ventures' 2000 return could be used to reduce business income on an individual return. This evidence, though arguably weak, was sufficient to allow a rational jury to sustain Kayser's defense. The district court therefore abused its discretion in failing to instruct the jury on this theory.[6]

## C.

We thus conclude that the requested jury instruction was supported by law and had sufficient foundation in the evidence. Because the district court erred in declining to instruct the jury on Kayser's theory of defense, we reverse Kayser's conviction.[7]

---

[6]In discussing the weakness of Kayser's evidence, the dissent merges the two separate counts of Kayser's indictment by noting that "[t]o escape conviction, . . . Kayser had to show that he had enough deductions to shelter *both* his 1999 and 2000 income." Dissent at 6589 (emphasis in original). There is no dispute that Kayser did not have sufficient deductions to offset both his 1999 and 2000 income. However, Kayser may still raise a deficiency defense with respect to the second count of his indictment (relating to the 2000 tax year) when a rational jury could conclude that Kayser had sufficient allowable deductions to negate the government's proof of deficiency with respect to that year.

[7]Kayser argues that any instructional error by the district court cannot be harmless. *See United States v. Escobar De Bright*, 742 F.2d 1196, 1201-02 (9th Cir. 1984) (holding that an erroneous refusal to give defendant's proposed theory of defense instruction is reversible per se). We

REVERSED and REMANDED.

KOZINSKI, Circuit Judge, dissenting:

The majority begins its analysis by dutifully reciting a well-established rule: "A defendant may negate the element of tax deficiency in a tax evasion case with evidence of unreported deductions." Maj. op. at 6576 (citing *United States* v. *Marabelles*, 724 F.2d 1374, 1378-89 (9th Cir. 1984); *Elwert* v. *United States*, 231 F.2d 928, 933 (9th Cir. 1956)). But it then jumps the rails by removing the word "unreported" and allowing a defendant to escape a criminal tax conviction by re-characterizing *reported* deductions. *Id.* at 12. This new rule finds no support in our caselaw and conflicts with *United States* v. *Miller*, 545 F.2d 1204 (9th Cir. 1976), and *United States* v. *Boulware* (*Boulware II*), 470 F.3d 931 (9th Cir. 2006). Even if this new rule were permissible, defendant did

have not revisited *Escobar De Bright* in light of *Neder v. United States*, 527 U.S. 1 (1999). Nor do we need to, because the district court's failure to give Kayser's proposed instruction prevented him from making a significant challenge to the deficiency element of the tax evasion count for the year 2000, and thus cannot be harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18 (1967).

Kayser also argues that he was wrongfully prevented from introducing evidence to support his theory of defense and that the district court misapplied the Sentencing Guidelines in determining the total tax loss by refusing to reduce Kayser's 2000 unreported income by the deductions he reported on Aspen Ventures' 2000 return and carried back to 1999. Given our reversal and remand for a new trial, we do not reach these issues.

Finally, Kayser asserts that his indictment should be dismissed because the grand jury was improperly instructed. However, as Kayser acknowledges, our precedent has squarely rejected his position and we therefore affirm the district court's denial of Kayser's motion to dismiss the indictment. *See United States v. Navarro-Vargas*, 408 F.3d 1184 (9th Cir. 2005) (en banc); *United States v. Cortez-Rivera*, 454 F.3d 1038 (9th Cir. 2006).

not present evidence that could support such an instruction. For both these reasons, I respectfully dissent.

**1.** Kayser was charged with tax evasion for failing to report income on his 2000 individual return. His proposed instruction would have allowed the jury to apply the $49,026 in deductions, which he had reported on his corporate tax return, to his personal income. As the government argued at trial, this defense is foreclosed by *Miller*. In *Miller*, we dealt with a highly analogous situation, where the taxpayer wished to re-characterize a distribution from his corporation as a return of capital, rather than as a dividend. Miller's argument, like Kayser's, was that what mattered was the reality of the transaction, not the way he initially papered it. We rejected this contention. Our rationale for reaching this conclusion is highly instructive:

> In civil tax cases the purpose is tax collection and the key issue is the establishment of the amount of tax owed by the taxpayer. In a criminal tax proceeding the concern is not over the type or the specific amount of the tax which the defendant has evaded, but whether he has willfully attempted to evade the payment or assessment of a tax. *Goldberg*, *supra*, 330 F.2d at 40; *Simon*, *supra*, 248 F.2d at 876.

> The difficulty in *automatically* applying the constructive distribution rules to this case is that it completely ignores one essential element of the crime charged: the willful intent to evade taxes, and concentrates solely on the issue of the nature of the funds diverted. That latter aspect is not the important element. Where the taxpayer has sought to conceal income by filing a false return, he has violated the tax evasion statutes. It does not matter that that amount could have somehow been made non-taxable if the taxpayer had proceeded on a different course.[12] To apply the constructive distribution rules to this

situation would nullify all of the taxpayer's prior unlawful acts.

---

[12]At the time the funds are initially diverted, it might well be argued that they could constitute either income or a return of capital. However, once the taxpayer has assumed control of the funds and then fails to report such funds as income or to make any adjustments in the corporate books to reflect a return of capital, he has already violated the tax evasion statutes. *Accord*, *Spies* v. *United States*, 317 U.S. 492, 498-99, 63 S.Ct. 364, 87 L.Ed. 418 (1943); *United States* v. *Swallow*, 511 F.2d 514, 521 (10th Cir.), *cert. denied*, 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66 (1975).

*Miller*, 545 F.2d at 1214 & n.12; *see also Boulware II*, 470 F.3d at 933-35 (same).

Under this rule, a defendant in a criminal tax case is bound by the way he papered the transaction at the time he earned the income in question. In *Miller*, the taxpayer was bound by the fact that his corporate books did not reflect the distribution as a return of capital. That he could later, as a matter of economic reality, claim that the distribution was a return of capital was of no consequence, because contemporaneously maintained records did not support that re-characterization. *Miller* went on to explain:

> In holding that the constructive distribution rules should not automatically be applied, it is not herein asserted that diverted funds could never be a return of capital. However, to constitute the latter, there must be some demonstration on the part of the taxpayer and/or the corporation that such distributions were intended to be such a return. To hold otherwise would be to permit the taxpayer to divert such funds and if not caught, to later pay out another return of capital; or if caught, to avoid conviction by raising the defense that the sums were a return of capital and hence non-taxable.

545 F.2d at 1215 (footnote omitted); *see also Boulware II*, 470 F.3d at 934 ("[D]efendant must show not merely that the funds *could* have been a return of capital, but that the funds were *in fact* a return of capital at the time of the transfer.").

Although this rule creates some tension with *Marabelles* and *Elwert*,[1] these cases can be reconciled because *Marabelles* and *Elwert* deal with the situation where the taxpayer failed to claim deductions. In such circumstances, the deductions are unreported, so the taxpayer is not bound under *Miller* by any prior characterization. Unlike in *Marabelles* and *Elwert*, defendant here did not fail to report business expenses on his return; he claimed the deductions on his corporate return and carried back the losses to wipe out tax liability for the prior year. Kayser's act of claiming the deductions on his corporate return was not merely proof of the underlying reality; it *was* the reality because it had a legally operative effect: Had Kayser not been audited, these deductions would have been carried back to reduce his corporate tax liability to zero for 1999; his 2000 personal tax liability would have been zero because of his failure to declare income.

The IRS, however, did audit Kayser and found that he had underreported his personal income in 2000. If the deductions are shifted from his corporate to his individual return, this would affect his 1999 corporate tax liability. The same deductions cannot be used twice: He can either use them to wipe out his 2000 personal income *or* he can carry them back to wipe out his 1999 corporate income. Having chosen to do the latter

---

[1]This tension was pointed out by Judge Thomas's concurring opinion in *Boulware II*. Judge Thomas criticized *Miller* because it holds that "a defendant may be criminally sanctioned for tax evasion without owing a penny in taxes to the government. Not only does this result indicate a logical fallacy, but is in flat contradiction with the tax evasion statute's requirement of 'the existence of a tax deficiency.'" 470 F.3d at 938 (Thomas, J., concurring) (quoting *Marabelles*, 724 F.2d at 1379). Nevertheless, Judge Thomas, like the *Boulware II* majority, concluded that they were bound by *Miller* and ruled in favor of the government.

when he filed his returns, the deductions are used up and are not available to offset his 2000 personal income. Contrary to the majority's holding, *Marabelles* and *Elwert* are thus not on point because Kayser does not have allowable deductions that were not reported on his return. Even if the deductions in question could have been treated as personal deductions, had Kayser claimed them as such on his individual return, the district court properly concluded that Kayser is stuck with the way he reported them at the time—which was as corporate deductions. To let him now go back and treat the deductions as applicable to his personal income allows for precisely the kind of heads-I-win, tails-the-government-loses scenario that *Miller* sought to foreclose.

**2.** Even under the majority's new rule, the district court did not abuse its discretion in refusing to give the proposed instruction because Kayser did not present sufficient evidence to warrant the instruction. Kayser needed to establish that he had enough allowable deductions to eliminate tax liability. In other words, he needed to show that he would have and *could* have reported sufficient deductions to offset all income. The majority strains to find "arguably weak" evidence in the record to support both propositions, *see* maj. op. at 6581-83, but the evidence on both counts falls far short of providing a sufficient basis "upon which the jury could rationally sustain the defense." *United States* v. *Jackson*, 726 F.2d 1466, 1468 (9th Cir. 1984) (per curiam); *see also United States* v. *Streit*, 962 F.2d 894, 898 (9th Cir. 1992) (same) ("The 'merest scintilla of evidence,' however, will not suffice." (quoting *Jackson*, 726 F.2d at 1468)).[2]

---

[2]Nor did the district court prevent defendant from presenting evidence to support the proposed instruction. The majority does not reach this issue, *see* maj. op. at 6583-84 n.7, but it's worth noting that the district court gave defendant ample opportunity to introduce such evidence. When defendant first raised the issue on the penultimate day of trial, the court noted that "you may have a problem given the state of the evidence if you argue that, but you may not. It just depends on how everything comes in

Kayser reported $49,026 in business expenses on his 2000 corporate return and carried back these expenses to eliminate his corporate tax liability for 1999. He was able to carry back these losses because he failed to report $41,765 of personal income from A2Z in 2000 and thus had no 2000 reported income against which to claim deductions.[3] Unlike *Marabelles* and *Elwert*, therefore, the deductions Kayser wanted to use to offset his unreported 2000 income at the time of trial were not unused. Rather, they were doing work in sheltering his 1999 corporate income. Had the 1999 tax year been beyond the government's reach, perhaps Kayser could have argued that he had erred in assigning the deductions (for his 2000 expenses) to his corporate return and carrying them back to 1999. The majority's new rule would allow that (though *Miller* would, in my view, prohibit it).

But the 1999 tax year was not beyond the government's reach. In fact, Kayser was being tried for tax evasion for both 1999 and 2000. To escape conviction, therefore, Kayser had to show that he had enough deductions to shelter *both* his 1999 and 2000 income. There just weren't enough deductions to do this. On his 1999 corporate return, Kayser reported

---

and what the arguments are, what the objections are. And I can't rule hypothetically every permutation of argument that we might hear in the case. We'll just have to defer that until the time of argument." When defendant presented his proposed instruction the next day, the court similarly noted, "Well, I'm going to decline to give this instruction at this point; the evidence doesn't support it." Defendant thus cannot blame the district court for his failure to present the requisite evidence.

[3]At trial, the IRS case agent testified that Kayser underreported his 2000 personal income by $53,445, but the government's expert calculated the figure more conservatively at $41,765. *See* maj. op. at 6574 n.2. The district court relied on the more conservative calculation at sentencing, and the government relies on the same figure on appeal. While we also must rely on the conservative calculation here, it's worth noting that Kayser concedes that he'd have no defense if the jury bought the higher calculation because he wouldn't have had sufficient deductions to eliminate all tax liability.

$104,532 in income; he paid taxes on none of it because he claimed $111,061 in deductions to wipe out his 1999 corporate income—including $49,026 in carryback losses from 2000. If he shifted $41,765 of these deductions to cover his unreported income for 2000, that would have left him only $69,296 in deductions for 1999 to offset the $104,532 in income reported on his corporate return. Thus, even assuming Kayser were allowed to reassign some or all of his deductions from 1999 to 2000, he would have some unsheltered income in one or both years; the majority admits as much. *See* maj. op. at 6583 n.6.

Which is no doubt why the record is so muddy as to whether Kayser would or could have reassigned the deductions to his personal income: Had Kayser shown unequivocally that the deductions were available in 2000, and that he would have claimed them that year, he would have exposed himself to a conviction for tax evasion in 1999. Kayser therefore hedged his testimony. On direct examination, Kayser indicated that "every deduction on [his] corporate return . . . related to [his] A2Z income," and that he would "have attempted to declare *some* of the deductions" on his individual return. (Emphasis added.) On cross-examination, Kayser testified that the 2000 business expenses "could have been [Aspen Ventures expenses], yeah, but they were primarily due to the consulting business [apparently referring to his employment with A2Z] as well as Image Network, or Clear Blue Media is otherwise known as." When pressed further, Kayser testified that these were Aspen Ventures expenses "if I'm understanding—I'm getting a little confused, but yes."

Note that Kayser made only very broad statements that the deductions relate to his personal income, and even then he hedged quite a bit: He claimed he would have attempted to declare *some* of those deductions on his individual return. He didn't say what portion of the $49,026 he would have claimed; it could have been $41,765 or more, or it could have been less. It's even less clear when we consider his backtrack-

ing on cross-examination: He admitted that some of the expenses "could have been" attributable to Aspen Ventures, and that the expenses "were primarily due to the consulting business as well as Image Network." Again, we don't know which portion. As the majority notes, it is defendant's burden to show that the claimed expenses would have reduced his income to zero for the relevant tax year (here 2000). Maj. op. at 6577 (citing *Marabelles*, 724 F.2d at 1379 n.3; *Elwert*, 231 F.2d at 933). On this record, a rational jury could not find that Kayser had shown sufficient business expenses that he would have used to offset all tax liability for 2000.

Even assuming Kayser had testified that he would have claimed *all* the deductions on his individual return, this wouldn't have been enough. To wipe out his 2000 unreported income, Kayser also had to show that the deductions would have been *allowable*. *See* maj. op. at 6582 (citing *Marabelles*, 724 F.2d at 1379 n.3; *Elwert*, 231 F.2d at 933). It's a point Kayser did not address in his testimony. The question then is whether the other two witnesses—the government's expert and Kayser's accountant—addressed the allowability of the deductions. The government's expert certainly provided Kayser no help. On cross-examination, the expert indicated that it was "theoretically" possible that Kayser could have claimed the deductions on his individual return "*if* those deductions had passed the many different requirements that the IRS imposes in order to claim the deductions related to the business incurred for furthering the business." (Emphasis added.) A theoretical possibility, however, is not evidence, not even "arguably weak" evidence, that such deductions were indeed allowable on Kayser's individual return. The government's expert never said that any of the expenses were actually allowable to offset Kayser's personal income.

This brings us down to the accountant's testimony. Kayser's accountant (who was the government's witness) testified on direct that "*[i]f* the deductions were attributable to Mr. Kayser and had he paid those personally, he could have

deducted those personally . . . and the tax return for the corporation would have been nonexistent; it just would have been a zero return." (Emphasis added.) On cross-examination, the accountant testified that "*if* in fact the corporation was not the recipient of the income and we pick that up on Michael Kayser's personal tax return and we pick up the expenses and all of them are—all the income is reported and all expenses are allowable, I don't—I cannot see a significant change in the tax." (Emphasis added.) On re-direct, he indicated that if Kayser had accurately reported his individual income, Kayser would have had to file a "new tax return or amended tax return," and "certain other parts of the tax return [would be] inapplicable or at least [would need] to be amended."

The majority seems to think it's sufficient that "both the government's expert and Kayser's accountant testified that as a general matter, business expenses of the type reported on Aspen Ventures' 2000 return could be used to reduce business income on an individual return." Maj. op. at 6582-83. But the majority does not examine what the witnesses actually said. Significantly, the majority points to no statement by either witness that supports its watery characterization. In fact, neither witness testified that the actual business expenses reported by Aspen Ventures were allowable on Kayser's individual return. Kayser's accountant, like the government's expert, assumed hypothetically that the deductions were allowable and then opined what effect this would have had on Kayser's 2000 individual return. Even then, the accountant hedged, suggesting that other parts of the return would have to be amended. Nowhere did he say that the deductions were actually allowable under the tax code; nor did he claim that Kayser's hypothetical individual return, when adjusted properly, would have resulted in zero tax liability.

In short, Kayser did not provide sufficient proof to enable a rational jury to find that he had enough allowable deductions to reduce his 2000 personal tax liability to zero. Nor could he, given that he needed these same deductions to shel-

ter his 1999 income. Under these circumstances, the district court did not abuse its discretion in refusing to give the instruction. *See Streit*, 962 F.2d at 898. Indeed, it did exactly what a district court *should* do when a party proposes an instruction that's not supported by the evidence.

*          *          *

In reversing defendant's conviction, the majority creates a defense against criminal tax liability that conflicts with established circuit precedent. And it does so unnecessarily, as defendant has fallen far short of meeting his burden to warrant the erroneous instruction. The majority thus eviscerates the evidentiary standard for proposed jury instructions by forcing a district court to give an instruction that's only supported by generalities and hypothetical possibilities. I must part company with my colleagues in both of these precarious endeavors.